1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                        FOR THE DISTRICT OF ARIZONA
8
9   Leonard Duane Griffith,          )   No. CV 13-00612-GMS (MHB)
                                      )
10            Petitioner,             )   **REPORT AND RECOMMENDATION**
                                      )
11  vs.                               )
                                      )
12                                    )
    Dennis R. Smith, Warden,          )
13                                    )
              Respondent.             )
14                                    )
                                      )
15  _____)
16  TO THE HONORABLE G. MURRAY SNOW, UNITED STATES DISTRICT JUDGE:

17          On March 26, 2013, Petitioner Leonard Duane Griffith, an inmate currently

18  incarcerated at the Federal Correctional Institution ("FCI"), Phoenix, Arizona, filed a *pro se*

19  Petition for Writ of Habeas Corpus (hereinafter "habeas petition") pursuant to 28 U.S.C.

20  §2241, challenging the Bureau of Prisons' finding of guilt on the charge of Possessing a

21  Hazardous Tool, and requesting a restoration of 41-days loss of good time, and "any other

22  relief this Court deems appropriate." (Doc. 1.)  On August 8, 2013, Respondent  filed his

23  Answer urging the Court to deny Petitioner's habeas petition on the merits.  (Doc. 8.)  On

24  September 11, 2013, Petitioner filed a Traverse in opposition to Respondent's Answer. (Doc.

25  10.)

26                              **BACKGROUND**

27          Petitioner is currently an inmate housed at FCI, Phoenix, Arizona, and is serving a

28  262-month sentence for drug offenses, with a projected release date of June 18, 2026. (Doc.

8-1, at 4 ¶¶3, 4.)

On April 15, 2012, prison staff searched Petitioner's jail cell and found several items of contraband, namely: an altered hair trimmer motor wired to a battery pack; an inmate-manufactured heating device (colloquially referred to as a "stinger," which is commonly used to create intoxicants); a vial containing a crushed substance; and, a six-inch plastic rod with a sharpened tip on one end and a handle fashioned with tape on the other. (Doc 8-1, at 33 ¶4.) The officer that discovered these items charged Petitioner with three prohibited acts: Code 104, Possession, Manufacture, or Introduction of a Gun, Firearm Weapon, Sharpened Instrument, Knife, Dangerous Chemical, Explosive, Ammunition, or any Instrument Used as a Weapon; Code 302, Misuse of Authorized Medication; and Code 305, Possession of anything not authorized for retention or receipt by the inmate, and not issued to him through regular channels. (Id.)

Petitioner was served with the incident report later that evening by a Lieutenant, who informed Petitioner of his rights, and investigated the incident. (Doc. 8-1, at 33 ¶5.) Petitioner indicated he understood his rights and made the statement, "it is not a weapon," but did not request that the Lieutenant interview any witnesses. (Id., 39.) The Lieutenant then determined that Petitioner was correctly charged, based upon the information contained in the incident report, and directed that Petitioner remain in the Special Housing Unit pending a Unit Discipline Committee ("UDC") hearing. (Doc. 8-1, at 33 ¶5.)

The UDC hearing commenced the following morning, during which time Petitioner asserted that the alleged weapon was "a plastic stick utilized in UNICOR[1] for soldering." (Doc. 8-1, at 33 ¶6.) Petitioner also asserted that "[t]hat's the way it comes in UNICOR," and "[t]he motor is part of my clippers." (Id.) The UDC found that Petitioner had committed the prohibited acts and referred the matter to the Discipline Hearing Officer ("DHO"). (Id.) On April 16, 2012, a UDC staff representative provided Petitioner with a

---

[1]UNICOR is the trade name for the Federal Prison Industries, the primary work program for federal prison inmates. (Doc. 8, at 4, fn. 2.)

1    notice of the DHO hearing and an advisement of his rights.  (Doc. 8-1, at 34 ¶7, 41-42.)
2    Petitioner acknowledged receipt of the notice and advisement.  (Id.)

3       The UDC representative provided additional information with the DHO referral.
4    Specifically, he provided the DHO with a memorandum of an interview he conducted with
5    a UNICOR Assistant Factory Manager during which the Manager confirmed that the
6    UNICOR tool found in Petitioner's cell made of hard plastic and was not to be removed from
7    the UNICOR area. (Doc. 8-1, at 34 ¶8, 44.)  He also provided a memorandum confirming
8    that the crushed substance was indeed a medication prescribed to Petitioner, but which was
9    only to be administered in pill form.  (Id., at 34 ¶8, 45.)  The UDC representative furthermore
10    provided pictures of the UNICOR tool and the other two devices found during the search of
11    Petitioner's jail cell.  (Id., at 34 ¶8, 36-37.)

12       On April 24, 2012, the DHO convened a video conference disciplinary hearing. The
13    DHO confirmed with Petitioner that he had received advance notice of the charges against
14    him and that he was advised of his rights before the DHO.  (Doc. 8-1, at 34 ¶9, 50.)  The
15    DHO also confirmed that Petitioner waived his right to have a staff representative, and again
16    advised Petitioner of his rights, which Petitioner acknowledged,  and read the incident report
17    to him.  (Id.)  Petitioner denied the charges against him and indicated that he was ready to
18    proceed to the hearing.  (Id.)  Petitioner stated that the crushed substance was an antacid, and
19    not the medications identified in the incident report or in the memorandum submitted by the
20    UDC representative; he stated that the "plastic found in his cell wasn't a weapon but rather
21    a tool he removed from UNICOR"; he stated that he knew he wasn't supposed to remove the
22    item from UNICOR but it wasn't intended to be a weapon:  and he admitted possessing the
23    stinger.  (Id., at 34 ¶10; 49.)

24       Petitioner did not request witnesses.  (Doc. 8-1, at 35 ¶11, 50.)  The DHO received
25    as documentary evidence the Incident Report and Investigation, and the photographs and
26    memorandums submitted by the UDC representative.  (Id., at 50.)  The DHO found that
27    Petitioner committed the prohibited acts of Possessing a Hazardous Tool, Code 108 and
28    Possessing an Unauthorized Item.  (Id.)  The DHO found that Petitioner committed Code

108, a similar act to code 104, the code Petitioner was originally charged with. (Id.)  The DHO found insufficient evidence to support a finding that Petitioner committed the prohibited act of Code 302.  (Id.)  The DHO also made the following specific findings in support of his decision:

> The reporting Officer's first hand eyewitness account. On 4-15-2012, at 6:30 p.m., the reporting officer searched your [] cell in Yuma.  During the search, the staff member found an altered hair trimmer motor affixed to a battery pack forming a tattoo gun along with several needles.  Staff also found a manufactured heating device (commonly referred to as a "stinger") and a vial of crushed powder identified in the report as Wellbuterin.  Also found was a sharpened plastic rod with a tip on one end and a tape handle on the other end.

> The DHO reviewed the photo sheet depicting the sharpened plastic rod.  The item depicted is capable of causing serious injuries and is capable of evading metal detection.  The DHO took into consideration that the item is a tool obtained from UNICOR.  You said you were aware that you were not supposed to remove the item from UNICOR but did anyway.  You indicated during the hearing that you were using it for benign harmless purposes.  However, the DHO observed the item depicted in the photo sheet and determined that the "tool" you took from UNICOR is capable of being used as a weapon.  During the DHO's correctional experiences he has observed similar items used as weapons which had caused serious injury to inmates.  Also, the memorandum provided by S. Gonzales provided evidence that the "tool" was made from hard plastic and sharp.

> Based on the greater weight of evidence, the DHO finds you committed the prohibited act of Code 108, Possession of a Hazardous Tool, a similar act to the code the inmate was initially charged with, Code 104, Possessing a Dangerous Weapon.  A hard plastic tool readily capable of being used as a stabbing type weapon was found in your possession.

> The DHO considered your statement during the hearing.  You admitted possessing a heating device manufactured to heat items (Stinger).  The DHO reviewed the photo sheet which depicted a commonly inmate manufactured heating device.  This item is commonly used by inmates to heat ingredients to manufacture intoxicants.

> Based on the facts, evidence and your admission to possessing the stinger (an unauthorized item), the DHO finds you committed the prohibited act of Code 305, Possessing an Unauthorized Item.

(Doc. 8-1, at 50-51.)

As a result of the finding of a Code 108 prohibited act, the DHO imposed the following sanctions:   60-days disciplinary segregation; disallowance of 41-days Good Conduct Time, and loss of four months phone privileges. (Doc. 8-1, at 35 ¶14, 51-52.)  The DHO imposed a loss of commissary privileges for 6 months for the Code 305 violation.  (Id.)  Petitioner was provided with a copy of the DHO decision.  (Id., at 35 ¶15, 52.)

1   Petitioner filed an administrative appeal of the DHO decision to the Regional Office,

2   arguing that the UNICOR tool was not a hazardous tool, as it is not classified as an "A or B

3   Tool" and was "thin and extremely flexible." (Doc. 8-1, at 4-5 ¶7, 25.) On June 11, 2012,

4   the Regional Director upheld the DHO's findings. (Id., at 5 ¶7, 26.) Petitioner appealed the

5   Regional Director's decision to the General Counsel, arguing that the UNICOR tool did not

6   meet the definition of hazardous under Bureau of Prison's ("BOP") Policies that govern the

7   classification of BOP property, and denote Class A Hazardous Tools as "most likely to be

8   used in an escape or an attempted escape: Used to manufacture or serve as weapons capable

9   of doing serious bodily harm." (Id., at 28-29.) On April 10, 2013, the General Counsel

10  upheld the DHO findings. (Id., at 5 ¶8, 30.)

11                              **ARGUMENT**

12        Federal prisoners have a statutory right to good time credits. See 18 U.S.C. §2634.

13  The Due Process Clause of the Fourteenth Amendment extends to discipline hearings at

14  which an inmate may lose good conduct sentence credits to which he is otherwise entitled.

15  Wolff v. McConnell, 418 U.S. 539, 557 (1974). Although the Supreme Court held that the

16  full panoply of Due Process rights do not apply in the prison discipline context, an inmate

17  subject to disciplinary sanctions that can impact a protected liberty interest must be afforded:

18  1) 24-hour advanced notice of the charge(s) against him; 2) a written statement by the fact

19  finder as to the evidence relied on and the reasons for the action; 3) an opportunity to call

20  witnesses and present documentary evidence; 4) assistance at the hearing if he is illiterate or

21  if the matter is complex; and, 5) an impartial fact finder. Wolff, 418 U.S. at 563-72.

22        The Due Process Clause requirements are satisfied if "some evidence" supports the

23  decision of the disciplinary tribunal. Superintendent, Mass. Correctional Institution,

24  Walpole v. Hill, 472 U.S. 445, 456-57 (1985). Under that standard, "the relevant question

25  is whether there is any evidence in the record that could support the conclusion reached by

26  the disciplinary board." Id., at 455. The standard is "minimally stringent." Cato v. Rushen,

27  824 F.2d 703, 705 (9th Cir. 1987). It only requires "*any* evidence in the record that could

28  support the conclusion reached by the disciplinary board." Id. (quoting Hill, 472 U.S. at 455-

456, emphasis added in <u>Cato</u>).  The "some evidence standard" does not require a court to examine the entire disciplinary record, perform an independent assessment of credibility of witnesses or re-weigh the evidence.  <u>Hill</u>, 472 U.S. at 455.

Petitioner claims that he was denied Due Process because the DHO "found Petitioner guilty without viewing the evidence or determining if the plastic solder aide met the definition of a Class 'A' tool ... [under] Bureau Policy." (Doc. 1, at 4.) Petitioner asserts that "there is no evidence to support a finding that the UNICOR tool was in fact a hazardous tool." (Doc. 10, at 2.)

The Court finds that Petitioner was afforded all of the procedural protections to which he was entitled relating to the DHO hearing.  Petitioner was given adequate notice, and the opportunity to call witnesses and present evidence on his behalf, but failed to do so. Furthermore, Petitioner makes no assertion that the DHO was not an impartial fact finder. Petitioner challenges the DHO's finding of the Class 108 violation, arguing that the DHO improperly concluded that the UNICOR tool was a hazardous tool.  He also suggests that the DHO improperly based his findings on a picture of the tool, as opposed to viewing the actual tool.

The evidence on the record before the DHO was sufficient to support the finding of a Class 108 violation. The DHO considered the photograph of the UNICOR tool, as well as a memorandum which described it as a six-inch, sharpened hard plastic rod, with a handle fashioned by tape on one end and a sharp point on the other, and found that it was "readily capable" of being used as a stabbing type weapon.   During the hearing, Petitioner did not challenge whether or not the photograph was an accurate depiction of the tool, or request that the DHO view the actual tool. Petitioner only asserted that he was using the tool for benign, harmless purposes. Petitioner now attaches to his habeas petition a copy of a photograph he asserts depicts the UNICOR tool in a bent shape, and argues that if the DHO had seen the actual tool he would not have reached the same conclusion. (Doc. 1, at 22.) The fact that the tool may be capable of being bent, however, does not contradict the DHO's finding that the tool was hard plastic and sharp and taped on one end and could be used as a stabbing

- 6 -

1    weapon.  The Court finds that the DHO's decision was supported by substantial evidence.

2          Although Petitioner argued for the first time on appeal that the UNICOR tool does not

3    meet the BOP policy guidelines defining "hazardous tool," and therefore did not properly

4    exhaust the claim, the Court finds that Petitioner's argument, nonetheless, fails on its merits.

5    Petitioner asserts that BOP policy classifies various tools by letter (AA=Dangerous,

6    A=Hazardous, or B=Non-Hazardous) for the purpose of identifying them, tracking them, and

7    managing their use by inmates. (Doc. 1, at 18.)  Petitioner asserts that BOP policy defines

8    a Class A Hazardous tool to include tools most likely to be used in an escape or attempted

9    escape, or used as weapons capable of doing serious bodily harm.  (Id.)  He claims that

10   UNICOR failed to treat the UNICOR tool found in Petitioner's possession like a Class A

11   hazardous tool is supposed to be treated under BOP policy (i.e., restricting inmate access to

12   them, locking them behind 2 locked doors, or shadowing them in red), and that therefore, the

13   tool is not a hazardous tool under the policy and Code 108.  (Doc. 1, at 18.)

14          First, the failure of UNICOR to follow BOP policy as to identifying or managing

15   tools does not change the policy definition of a Class A Hazardous tool to include a tool

16   "capable of doing serious bodily harm."  The DHO made a finding that the UNICOR tool

17   could be used as a stabbing tool to cause serious bodily injury, which is consistent with the

18   policy definition.  Second, BOP policies are "rules of practice and do not rise to the status

19   of law."  Floyd v. Henderson, 456 F.2d 1117, 1119 (5th Cir. 1972) (a prisoner transfer that

20   was otherwise lawful would not become unlawful merely because a prison policy was not

21   strictly followed).

22          Disciplinary regulations governing inmate discipline appear in the Code of Federal

23   Regulations.  According to the regulation defining the Code 108 prohibited act, hazardous

24   tools are "tools most likely to be used in an escape or escape attempt or to serve as weapons

25   capable of doing serious bodily harm to others, or those hazardous to institutional security

26   or personal safety; e.g., hack-saw blade, body armor, maps, handmade rope, or other escape

27   paraphernalia, portable telephone, pager, or other electronic device."  28 C.F.R. §541.3,

28   Table 1.  The DHO's finding that the UNICOR tool was a hazardous tool because it could

1   readily be used as a stabbing weapon to cause serious bodily injury fell squarely within the

2   regulation's definition.

3                                    **CONCLUSION**

4          This Court finds that the DHO performed a detailed analysis of the facts presented at

5   the hearing, and that the DHO's findings and conclusions were supported by ample, if not

6   substantial evidence.  Therefore, the Court finds that Petitioner was not deprived of his due

7   process rights in the DHO's finding that Petitioner violated Code 108, Possession of a

8   Hazardous Tool.  The Court will recommend that Petitioner's habeas petition be denied and

9   dismissed with prejudice.

10         **IT IS THEREFORE RECOMMENDED** that the Petition for Writ of Habeas

11  Corpus (Doc. 1) be denied and dismissed with prejudice.

12         This recommendation is not an order that is immediately appealable to the Ninth

13  Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

14  Appellate Procedure, should not be filed until entry of the district court's judgment.  The

15  parties shall have fourteen days from the date of service of a copy of this recommendation

16  within which to file specific written objections with the Court.  See 28 U.S.C. § 636(b)(1);

17  Fed. R. Civ. P. 6(a), 6(b) and 72.  Failure to timely file objections to the Magistrate Judge's

18  Report  and  Recommendation  may  result  in  the  acceptance  of  the  Report  and

19  Recommendation by the district court without further review.  See  United States v. Reyna-

20  Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to timely file objections to any factual

21  determinations of the Magistrate Judge will be considered a waiver of a party's right to

22  appellate review of the findings of fact in an order of judgment entered pursuant to the

23  Magistrate Judge's recommendation.  See Fed. R. Civ. P. 72.

24         DATED this 28th day of January, 2014.

25

26

27                                             Michelle H. Burns
                                               United States Magistrate Judge

28